THE LAW OFFICE OF HAYES & WELSH
Martin L. Welsh, Esq. (NV Bar No. 8720)
199 N. Arroyo Grande Blvd., Suite 200
Henderson, Nevada 89074
T: (702) 434-3444
E: mwelsh@lvlaw.com;

LAW OFFICE OF CHRISTOPHER J. GRAY P.C.
Christopher J. Gray (Counsel will comply with
LR IA 11-2 within 45 days.)
Michael Giarrusso (Counsel will comply with
LR IA 11-2 within 45 days.)
360 Lexington Ave, 14th Floor
New York, New York 10017
Telephone: (212) 838-3221
Facsimile: (212) 937-3139
Email: chris@investorlawyers.net
Email: mike@investorlawyers.net

[Additional Counsel Listed on Signature Page]

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| NOEL C. MURRAY and DR. SWARNA PERERA, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> PROVIDENT TRUST GROUP, LLC, and ASCENSUS, LLC, <br><br> Defendants. | Case No.: <br><br> CLASS ACTION COMPLAINT (Counsel will comply with LR IA 11-2 within 45 days) <br><br> JURY TRIAL DEMANDED |

# CLASS ACTION COMPLAINT

Plaintiffs Noel C. Murray and Dr. Swarna Perera ("Plaintiffs"), by and through their undersigned counsel, as and for their Class Action Complaint against Defendants Provident Trust Group, LLC ("Provident" or "PTG") and Ascensus, LLC ("Ascensus"), allege as follows based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief[1] as to all other allegations:

## NATURE OF THE ACTION

1.     This is a class action brought under Fed. R. Civ. P. 23(a) and (b)(3) for breach of Defendants' contractual and fiduciary duties as trustee and custodian of Plaintiffs' respective retirement accounts, gross negligence, unjust enrichment, and restitution.

2.     Plaintiffs are investors in Individual Retirement Accounts (IRAs) for which Provident acted as legal custodian.  In order to provide for and enhance the security of retirement income in the United States, a federal law imposes trustee status and minimum federal fiduciary standards of conduct on providers of certain

---

1. Allegations on information and belief are based upon the investigation by Plaintiffs' counsel, including a review of publicly available regulatory proceedings and related filings made by the Securities and Exchange Commission ("SEC" or the "Commission"), court papers, news articles, media reports, and other publicly-available information.

retirement-related services. *See, e.g.,* Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104, 1021-1031; Internal Revenue Code ("Code"), 26 U.S.C. 408; Treasury Regulation ("Treas. Reg.") 1.408-2, 26 C.F.R., promulgated pursuant to Code §§ 401 and 408.  Among the minimum federal fiduciary standards of conduct are those for persons providing services for federally-created IRAs, which include trustees and directed custodians such as PTG.

3.     Pursuant to federal law and in order to ensure the security of the retirement income from such property, each Plaintiff and Class Member entered into, as federal law requires, a trust with Defendants over the property transferred to the Defendants.  In order to secure the retirement income from the trust, federal law requires Defendants to act as trustees in a fiduciary relationship with each Plaintiff and Class Member.  These duties are applicable to Self-Directed IRAs ("SDIRAs"), a type of IRA account in which non-conventional investments are often held.

4.     Pursuant to federal law, Defendants were obligated to comply with the following minimum standards and owed the following duties to preserve the Trust res of each Plaintiff and Class Member:

(i)     The fiduciary duty to acquire and hold particular investments specified by the trust instrument. Treas. Reg. 1.408-2(e)(viii)(6)(i)(A).

(ii)    The fiduciary duty to keep custody of investments and, except for investments pooled in a common investment fund in accordance with the provisions of the Treasury Regulations, to refrain from commingling the investments of each account with any other property. Treas. Reg. 1.408-2(e)(v)(A).

(iii)   The fiduciary duty to deposit assets of accounts requiring safekeeping in an adequate vault. Treas. Reg. 1.408-2(e)(v)(B).

(iv)    The fiduciary duty to determine the assets held by it in trust and the value of such assets at least once in each calendar year and no more than 18 months after the preceding valuation. Treas. Reg. 1.408-2(e)(5)(ii)(E).

(v)     The fiduciary duty to receive, issue receipts for, and safely keep securities. Treas. Reg. 1.408-2(e)(4)(ii)(A).

5.      In addition to Treas. Reg. 1.408-2(e)(5)(ii)(E) and its guidance concerning valuation of assets, Defendants also entered into standardized form contracts with Plaintiffs and the Class, under which Defendants acknowledged their obligation as custodian to timely report asset valuation to the IRS: "Each year

(and when you take IRA distributions) we are required to report the fair market value ("FMV") of the assets within your IRA to the IRS." *See* Exh. 1, p. 7, Section 8.16 – Valuations Policy.

6.      Working closely with representatives of a securities issuer known as Woodbridge (as further defined below), Defendants took custody of unregistered securities that were not exempt from registration in IRAs that it maintained for hundreds of customers, many or most of whom were referred by Woodbridge's personnel and/or sales agents.  In certain instances, at the behest of Woodbridge, Defendants accepted transfer of substantial sums of money directly from other IRA custodians who refused to hold Woodbridge securities in IRAs for which they served as custodians.  In certain instances, Defendants allowed brokers or unlicensed sales agents for Woodbridge to pay for Defendants' custodian fees directly- a prohibited transaction under IRS regulations. *See* IRS Publication 590-A.

7.      On information and belief, Defendants took few or no steps to ascertain the nature, assets underlying, or value of Woodbridge securities that they held as custodian, despite their legal duty to determine the assets held by Provident in trust and the value of such assets at least once in each calendar year and no more than 18 months after the preceding valuation. Treas. Reg. 1.408-2(e)(5)(ii)(E).  The

purported third-party borrowers for most of the promissory notes sold by

Woodbridge were in actuality LLCs controlled by Woodbridge principal Robert H.

Shapiro ("Shapiro")- a fact that Defendants apparently failed to discover despite

Woodbridge's almost complete lack of any *bona fide* third-party borrowers and

nearly universal extension of "loans" to shell companies with no revenues and no

bank accounts.  Defendants also apparently failed to discover that nearly all of the

purported third-party borrowers never paid any interest whatsoever on the so-

called "loans" underlying the promissory notes.

    8.    Further, Defendants continued to accept Woodbridge securities as

custodian from numerous customers steered to Provident by Woodbridge and its

agents, even after regulatory actions by state and federal regulators that

unanimously concluded that Woodbridge was unlawfully offering unregistered

securities that were not within any exemption from registration to the general

public.  Woodbridge continued to work hand in glove with Provident as though

nothing was amiss, despite the following state and federal charges against

Woodbridge:

**Massachusetts:** In a May 2015 Massachusetts Consent Order, Woodbridge

and its affiliate entities were directed to "[p]ermanently cease and desist from

selling unregistered or non-exempt securities in the Commonwealth of Massachusetts."

**Texas:** On July 17, 2015, the Texas State Securities Board issued an Emergency Cease and Desist Order against Woodbridge entities and others, making factual findings that "Respondent Woodbridge, [and its principal] Shapiro… are offering for sale investments in Respondent Woodbridge's First Position Commercial Mortgage Note Program…[that] have not been registered by qualification, notification or coordination, and no permit has been granted for their sale in Texas." On March 18, 2016, Woodbridge (through its Woodbridge Mortgage Investment Fund 3) and Robert Shapiro consented to an order by the Texas State Securities Board concluding that Woodbridge and Shapiro violated the Texas Securities Act by offering unregistered securities.

**Arizona:** On October 4, 2016, the Securities Division of the Arizona Corporation Commission issued a Temporary Cease and Desist Order against Woodbridge, alleging violations in connection with failure to properly register securities (or, in the alternative, claim a valid exemption), and also alleged securities fraud in connection with the offer or sale of securities in violation of the Arizona Securities Act.

**Pennsylvania:** On April 24, 2017, the Commonwealth of Pennsylvania Bureau of Securities Compliance and Examinations entered into a Consent Agreement and Order and made findings that Woodbridge had operated in violation of the Pennsylvania Securities Act of 1972 by virtue of its attempt to "[e]ffect purchases or sales of securities issued by Woodbridge" where the individual selling these investment products was neither registered pursuant to Pennsylvania securities laws, nor exempt from registration.

**Michigan:** On August 8, 2017, the State of Michigan Securities Bureau issued a Cease and Desist Order as against Woodbridge affiliate Woodbridge Mortgage Investment Fund 2, LLC,  and made findings that Woodbridge "[o]ffered and sold [FPCMs] in Michigan that fell within the definition of 'security'; approximately 230 investors invested more than $14,000,000.00 with Respondent and its affiliated companies.  The [FPCMs] were not federally covered, exempt from registration, or registered."

**SEC:** On July 17, 2017, the SEC brought an enforcement action against Woodbridge in federal court in the Southern District of Florida to enforce a subpoena directed to Woodbridge.  On December 20, 2017, the Commission filed a Complaint for Injunctive and Other Relief alleging as follows:

> **"Beginning in July 2012 through December 4, 2017, Defendant [Robert Shapiro] used his web of more than 275 Limited Liability**

**Companies to conduct a massive Ponzi scheme raising more than $1.22 billion from over 8,400 unsuspecting investors nationwide through fraudulent unregistered securities offerings.** Despite receiving over one billion in investor funds, Shapiro and his companies only generated approximately $13.7 million in interest income from truly unaffiliated third-party borrowers. Without real revenue to pay the monies due to investors, Shapiro resorted to fraud, using new investor money to pay the returns owed to existing investors." (emphasis added).

9. Despite these publicly-announced state and federal charges, which uniformly alleged and/or concluded that Woodbridge was engaged in the unlawful sale of unregistered securities, on information and belief Provident took no steps to inform persons for whom Provident acted as custodian of any issues with Woodbridge, and continued to render statements showing Woodbridge investments at full value. Provident also made itself available to take custody of Woodbridge securities transferred over from other SDIRA custodians who had ceased doing business with Woodbridge at least **as late as November 2017.**

10. By their actions and inactions, Defendants breached contractual and fiduciary duties owed directly to Plaintiffs and the Class[2], were grossly negligent,

---

2. As set forth at ¶ 100, *infra,* the Class in this action ("Class") consists of all persons for whom Provident opened and/or maintained IRA accounts as custodian, that were invested in Woodbridge Securities (as defined above), at any time between January 1, 2014 and December 31, 2017 inclusive (the "Class Period"). Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with Woodbridge.

and were unjustly enriched, as further detailed below.  Plaintiffs now bring this class action seeking, *inter alia,* recovery of money damages.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter presented by this class action complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 102-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the federal courts of any class action in which any member of the plaintiff class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

12.     Plaintiffs allege that the total claims of the individual members of the Class in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5).

13.     Plaintiffs are citizens of Nevada and California, and as set forth below, Defendants can be considered citizens of Delaware (Ascensus's state of incorporation), Nevada (Provident's state of incorporation and location of its principal office) and Pennsylvania (the location of Ascensus's principal office) for purposes of diversity.  Therefore, diversity of citizenship exists under CAFA as

required by 28 U.S.C. § 1332(d)(2)(A) because "any member of a class of plaintiffs is a citizen of a State different from any defendant."

14.     Furthermore, Plaintiffs allege that more than two-thirds of all of the members of the proposed Class (as defined below) in the aggregate are citizens of a state other than Nevada, in which this action is originally being filed, and that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

15.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 because, as set forth below, Defendants conduct business in, and may be found in, this District.

## THE PARTIES

16(a).     Plaintiff Noel C. Murray, a resident of Henderson, Nevada, invested $54,148.84 in unregistered Woodbridge securities in or about September 2016.  These Woodbridge securities were held in an IRA account at Provident.

16(b).     Plaintiff Dr. Swarna Perera, a resident of La Canada Flintridge, California, invested $600,000.00 in unregistered Woodbridge securities in or about November 2017.  These Woodbridge securities were held in an IRA account at Provident.

17.     Defendant Provident is a Nevada limited liability company formed in 2009.  Provident's principal office is located at: 8880 W. Sunset Rd., Ste. 250, Las Vegas, NV.  PTG is a non-discretionary trustee, administrator and custodian of IRA assets, and currently maintains more than $4 billion in assets under custody and nearly 30,000 clients in all 50 states.

18.     Defendant Ascensus is a Delaware limited liability company formed in 2003.  Ascensus's principal office is located at 200 Dryden Road, Dresher, PA.  Ascensus is the nation's largest independent retirement plan and college savings services provider, with more than $163 billion in assets under administration.  Ascensus manages more than 54,000 retirement plans through various partnerships.  In October 2017, Ascensus entered into an agreement to acquire Provident as part of its retirement division.  Ascensus is jointly owned by private equity firms Genstar Capital and Aquiline Capital Partners.  Ascenscus and Provident are hereinafter sometimes referred to jointly as "Defendants".

## FACTUAL BACKGROUND

### *Provident as Trustee and Custodian of Self-Directed Individual Retirement Accounts*

19.     Provident occupies a unique position in the financial services industry, as a leading trustee and custodian for self-directed IRAs or SDIRAs, which are a type of IRA account in which investors may place a variety of assets, including

non-conventional investments.  As stated in 2013 by PTG's founder and current CEO, Ms. Theresa Fette, "Self-directed IRAs have existed for the last 40 years, but only 2 percent of the population even knows you can have one."

20.     SDIRAs are provided by some financial institutions in the United States in order to allow investors to invest retirement monies in certain alternative investments, including but not limited to real estate, physical commodities, private mortgages, private company stock, oil and gas limited partnerships, precious metals and artwork.

21.     In order to provide for and enhance the security of retirement income in the United States, a federal law imposes trustee status and minimum federal fiduciary standards of conduct on providers of certain retirement-related services, including IRAs and SDIRAs. See ERISA, 29 U.S.C. §§ 1104, 1021-1031; Code", 26 U.S.C. 408; Treas. Reg. 1.408-2, 26 C.F.R., promulgated pursuant to Code §§ 401 and 408.  Among the minimum federal fiduciary standards of conduct are those for persons providing services for federally created IRAs, which include trustees and directed custodians such as PTG. *Id*.

22.     Pursuant to federal law and in order to ensure the security of the retirement income from such property, each Plaintiff and Class Member entered into, as federal law requires, a trust with Defendants over the property transferred

to the Defendants. *Id*.  In order to secure the retirement income from the trust, federal law requires Defendants to act as "trustees" in a fiduciary relationship with each Plaintiff and Class Member. *Id*.  This relationship is fiduciary in nature but is defined, in part, by a contract between Plaintiffs and Defendants in a form conforming to ERISA and regulatory standards, which must be approved by U.S. government regulators.  A form of Defendants' Individual Retirement Custodial Account Agreement ("PTG Trust Agreement") in force for a portion of the Class Period herein is annexed as Exh. 1.

### *An IRA is a Federally-Created Trust*

23.     Individual Retirement Accounts came into existence in 1974, when they were created by the federal government in a statute known as the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, Title II, Sept. 2, 1974, codified at 29 U.S.C. § 1001 *et seq.*

24.     An IRA is a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries, but only if the written governing instrument creating the trust meets certain enumerated requirements, including, in relevant part: (i) that the trustee is a bank [as defined by statute] or such other person who demonstrates to the satisfaction of the Commissioner, that the manner in which the trust will be administered will be consistent with the

requirements set forth under the Code, (ii) that no part of the trust will be invested in life insurance contracts, (iii) that the interest of an individual in the balance in his account is nonforfeitable, and (iv) that assets of the trust will not be commingled with other property except in a common trust or common investment fund. Code § 408(a) (2008); *see also*, 26 C.F.R. Treas. Reg. § 1.408-2 (a-b).

25.    Here, the "written governing instrument creating the trust" was Defendants' standardized form contract, the PTG Trust Agreement, that was entered into by Plaintiffs and all Class Members. *See* Exh. 1.  This contract was drafted in its entirety by Defendants.  This non-negotiable contract was presented on a take-it-or-leave-it basis to Class Members and was not drafted, amended, or negotiated in any way by Plaintiffs or Class Members.

### *The Federally-Created Minimum Fiduciary Standards of Conduct for the IRAs at Issue Here*

26.    Section 408 of the Code, and the federal regulations promulgated thereunder, including C.F.R. § 1.408-2, use the language and terminology of trust law (such as "participant," "beneficiary," "fiduciary," and "trustee") in specifying the trust and the relationship that any form contract or "written governing instrument creating the trust" was required to create.

27.     Pursuant to federal law, Defendants were obligated to comply with the following minimum standards and owed the following duties to preserve the Trust res of each Plaintiff and Class Member:

(i)     The fiduciary duty to acquire and hold particular investments specified by the trust instrument. Treas. Reg. 1.408-2(e)(viii)(6)(i)(A).

(ii)    The fiduciary duty to keep custody of investments and, except for investments pooled in a common investment fund in accordance with the provisions of the Treasury Regulations, to refrain from commingling the investments of each account with any other property. Treas. Reg. 1.408-2(e)(v)(A).

(iii)   The fiduciary duty to deposit assets of accounts requiring safekeeping in an adequate vault. Treas. Reg. 1.408-2(e)(v)(B).

(iv)    The fiduciary duty to determine the assets held by it in trust and the value of such assets at least once in each calendar year and no more than 18 months after the preceding valuation. Treas. Reg. 1.408-2(e)(5)(ii)(E).

(v)     The fiduciary duty to receive, issue receipts for, and safely keep securities. Treas. Reg. 1.408-2(e)(4)(ii)(A).

/ / /

### *The Standardized Form Contract That Provident Created and Entered into with Class Members*

28.     In the context of the foregoing mandatory federal duties, Defendants created a standardized form contract, defined above as the PTG Trust Agreement. While the PTG Trust Agreement was drafted by Defendants, it conforms to IRS regulations and was approved by the IRS.

29.     Form 5305A, as promulgated by the Internal Revenue Service, sets forth the provisions which must be contained in a valid form of "Traditional Individual Retirement Custodial Account" under Section 408 of the Code.

30.     Form 5305A states that the model agreement set forth therein "meets the requirements of section 408(a)" and is thus pre-approved by the IRS.  Of note, however, Form 5305A does provide the caveat that "only Articles I through VII have been reviewed by the IRS."  Article VII of the model agreement serves as a repository for any additional provisions to be applied by the trustee and/or custodian.

### *Federal Approval of the Form of the Contracts*

31.     In addition to providing "pre-approval" to IRA custodial account agreements which conform to federal Form 5305A, the IRS reviews individual custodial account agreements to determine their compliance with federal law.

32.     Under the PTG Trust Agreement, Provident expressly provided that the contract would comply with and reflect federal standards and federal requirements; for example:

(i)     "The depositor named on the application is establishing a Traditional individual retirement account under section 408(a) to provide for his or her retirement and for the support of his or her beneficiaries after death." *See* Preamble of PTG Trust Agreement.

(ii)    "The custodian must be a bank or savings and loan association, as defined in section 408(n), or any person who has the approval of the IRS to act as custodian." *See* Definitions of PTG Account Agreement.

(iii)   "Each year (and when you take IRA distributions), we are required to report the fair market value ("FMV") of the assets within your IRA to the IRS.  The IRS definition of FMV is the price at which the asset would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having a reasonable knowledge of the relevant facts." *See* Section 8.16 – Valuations Policy, of the PTG Account Agreement.

/ / /

*IRS Rules Concerning Disqualified Persons and Prohibited Transactions*

33.     As set forth in IRS Publication 590-A, "Generally, a prohibited transaction is any improper use of your traditional IRA account or annuity by you, your beneficiary, or any disqualified person."

34.     Many prohibited transactions stem from the involvement of a disqualified person.  Examples of disqualified persons per IRS guidance as it relates to IRAs and SDIRAs include: the account owner, a beneficiary of the IRA, the account owner's spouse, plan service providers, and fiduciaries.  The term fiduciaries applies to advisors, custodians, and account administrators.

35.     Here, Defendants would meet the definition of a disqualified person as the plan service provider and custodian for the SDIRAs established by Plaintiffs and the Class.  Further, any financial advisor rendering advice for remuneration to Plaintiffs or members of the Class would also be considered a disqualified person per IRS guidance.

36.     With respect to disqualified persons, the IRS has provided ample guidance concerning what constitute prohibited transactions.  Examples of prohibited transactions include, but are not limited to: (i) the sale, exchange or leasing of a property between an IRA and a disqualified person, (ii) furnishing goods, services, or facilities between and IRA and a disqualified person, (iii) the

extension of credit or cash loan between an IRA and a disqualified person, and (iv) use of personal assets by a disqualified person to pay an IRA asset's expenses.

### Defendants' Ongoing and Pervasive Failures as Trustee and Custodian Over Plaintiffs' Assets

37.     From the outset, Defendants failed to properly safeguard and manage the IRA accounts of Plaintiffs and the Class in a professional and fiduciary manner in keeping with industry standards and in accordance with applicable state and federal laws.  The risks created by these derelictions materialized and caused Plaintiffs' losses when Woodbridge proved to be operating unlawfully.

38.     Defendants breached their professional and fiduciary duties as plan administrators and custodian of assets.  For example, pursuant to Treas. Reg. 1.408-2(e)(5)(ii)(E), PTG had an affirmative duty to determine the assets held by it in trust and the value of such assets at least once in each calendar year and no more than 18 months after the preceding valuation (*see supra*, ¶ 4).

39.     In addition to Treas. Reg. 1.408-2(e)(5)(ii)(E) and its guidance concerning valuation of assets, Defendants also entered into a contract with Plaintiffs and the Class, under which Defendants acknowledged their obligation as custodian to timely report asset valuation to the IRS: "Each year (and when you take IRA distributions) we are required to report the fair market value ("FMV") of

the assets within your IRA to the IRS."  *See* Exh. 1, p. 7, at Section 8.16 –

Valuations Policy.

40.     Here, despite Defendants' duties to "determine the assets held by"

Provident in trust, and timely assign a fair market value to the assets held by

Plaintiffs and Class Members in their respective SDIRAs each year, Defendants

apparently took no steps even to verify the general nature of Woodbridge

investments, their status as securities, their underlying assets, and/or their

registration status.

41.     Despite these duties, Defendants also:

(i)     failed to obtain audited financial statements for Woodbridge from a

recognized accountant to confirm the existence and value of the

underlying assets;

(ii)    failed to perform Generally Accepted Auditing Standard ("GAAS")

"audits" using whatever tests of the books or records were considered

necessary by a public accountant;

(iii)   failed to confirm that Woodbridge noteholders' liens on third-party

collateral were properly perfected;

(iv)   failed to contact beneficiaries during the course of their professional relationship, as is standard practice in the industry;

(v)   failed to prepare certain federally mandated (and contractually obligated) annual reports of transactions related to the IRA, including assigning an updated FMV as to the unregistered Woodbridge securities;

(vi)   as more fully described below (*see infra*, ¶¶ 86-99) failed to perform even the most basic due diligence and prudent custodial management on behalf of Plaintiffs and the Class, even after multiple state and federal regulators accused Woodbridge of serious violations of law.

42.   Finally, on information and belief Defendants routinely permitted disqualified persons such as financial advisors, salespeople and brokerage firms to pay IRA custodial fees to Defendants on behalf of Class members.  For example, Plaintiff Swarna Perera entrusted her hard-earned retirement funds to Defendants for purposes of establishing an SDIRA at the behest of her then-financial advisor, Mr. Max Hechtman.  In late 2017, Mr. Hechtman recommended that Ms. Perera roll over her then-existing retirement account in order to establish a SDIRA with Defendants.  In the course of setting up her SDIRA at Provident,  Hechtman

submitted a credit card authorization for a credit card in his own name and paid the fees charged by PTG for Ms. Perera's account.

43.    This payment was a prohibited transaction under applicable regulations, because by virtue of Mr. Hechtman's status as a fiduciary, he was a "disqualified person" and was *not permitted* to pay for any expenses related to Ms. Perera's SDIRA, including the annual $395 fee charged by Provident to SDIRA owners.

### Woodbridge Raises $1.2 Billion in Investor Capital Through a Nationwide Sales Network

44.    The Woodbridge Group of Companies, LLC (d/b/a Woodbridge Wealth) is based in Sherman Oaks, CA.  Together with its affiliate companies,[3] the Woodbridge Group of Companies, LLC is referred to herein as "Woodbridge". Formed in 2014, Woodbridge was founded by Mr. Robert Shapiro, and at its peak, the company employed approximately 140 persons in offices in six states.

45.    Woodbridge advertised its primary business as purportedly issuing loans to third-party commercial property owners who paid Woodbridge 11-15% annual interest for so-called "hard money" or short-term loan financing.

---

3. The Woodbridge affiliate companies as included in the definition of Woodbridge herein include: WMF Management, LLC, Woodbridge Structured Funding, LLC, Woodbridge Pre-Settlement Funding, LLC, Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC, Woodbridge Mortgage Investment Fund 3, LLC, Woodbridge Mortgage Investment Fund 3A, LLC, Woodbridge Mortgage Investment Fund 4, LLC, Woodbridge Commercial Bridge Loan Fund 1, LLC, Woodbridge Commercial Bridge Loan Fund 2, LLC.

Woodbridge represented that these were "secured" investments insofar as the company placed mortgages on the properties for which it lent money.

46.    Beginning as early as 2012, Woodbridge and its affiliate entities offered unregistered securities in derogation of federal and applicable state securities laws to investors in various locations across the United States, including but not limited to residents of Arizona, California, Colorado, Florida, Massachusetts, Michigan, Nevada, Ohio, Pennsylvania, and Texas.

47.    These unregistered Woodbridge securities were offered to investors in at least two forms: (i) subscription agreements for the purchase of equity interests in one of Woodbridge's seven Delaware limited liability companies ("Units"); and (ii) lending agreements, some of which were referred to as "First Position Commercial Mortgage Notes," "mezzanine loans," "construction loans," and "Co-Lending Opportunities" (collectively, "FPCMs").  Woodbridge FPCMs and Units are hereinafter sometimes collectively referred to as "Woodbridge Securities".

48.    With respect to Woodbridge Units, investors were asked to give Woodbridge at least $50,000 per Unit for a term of five years in exchange for a right to receive distributions and an equity interest in one of seven limited liability companies formed by Woodbridge in Delaware.  Units investors executed subscription and joinder agreements to memorialize the investment.

49.     As to the FPCMs, investors were solicited to invest anywhere between $25,000 to well over $250,000, with Woodbridge pooling these investor funds. Woodbridge would then lend the pooled investor capital to purported third-party borrowers for a short time at a high interest rate, ostensibly in order to facilitate the acquisition and/or development of real property.  In exchange for lending money to Woodbridge, FPCM investors were promised that they would earn a secured yield (*e.g.,* as high as 5-6% in some instances), payable in fixed monthly interest payments, for a term of nine, twelve, or eighteen months, with options to renew or "reposition" their lending toward different real estate deals at the end of the term. FPCM investors were informed that their investment was secured by a "collateral assignment of note, mortgage, and other loan documents," which would be recorded with the real property that was the subject of the loan.

50.     Woodbridge ultimately raised approximately $1.2 billion in investor capital, through the sales of unregistered securities to more than 8,000 investors nationwide.  In order to accomplish these sales, Woodbridge utilized in-house employees to market Woodbridge Units and FPCMs, as well as a nationwide network of external referrers, insurance salespersons, and financial advisors and planners.  Most of these persons acting as Woodbridge sales agents were **not** registered representatives with FINRA member firms, and therefore were **not**

licensed to sell securities.  In fact, many of Woodbridge's unlicensed sales agents were **former** licensed FINRA registered representatives who had lost their licenses to sell securities due to misconduct- a status that was readily discoverable via a rudimentary Internet search of FINRA's public database, accessible at https://brokercheck.finra.org/.

51.     Woodbridge and its sales agents routinely directed investors in unregistered securities to Provident, and assisted them in completing the paperwork to transfer their IRA assets from other IRA custodians to Provident. Provident, as an established IRA custodian, provided a veneer of respectability to Woodbridge and its motley assortment of sales agents, many of whom had never had licenses to sell securities or had lost their licenses, and operated small insurance sales or notary services offices out of strip malls and similar locations.

### Woodbridge's Business Model Attracts Regulatory Enforcement Actions and Litigation

#### Massachusetts

52.     Beginning as early as 2015, Woodbridge came under considerable scrutiny from state securities regulators across the United States.  For example, on May 4, 2015, the Commonwealth of Massachusetts Securities Division entered into a Consent Order with Woodbridge and certain of its funds ("Massachusetts Consent Order").  Through its findings of fact, Massachusetts securities regulators

noted that the Woodbridge investments offered to investors in that state were *neither* registered as securities in Massachusetts or on the federal level, *nor* were these investments exempt from registration as securities products. Attached hereto as Exh. 2 is a copy of the Massachusetts Consent Order.

53.    Pursuant to the May 2015 Massachusetts Consent Order, Woodbridge and its affiliate entities were directed to "[p]ermanently cease and desist from selling unregistered or non-exempt securities in the Commonwealth of Massachusetts."

54.    As enumerated in the Massachusetts Consent Order, Woodbridge investors "[m]ay have been uninformed of the potential risks typically associated with real estate transactions … [including the need to] rely on Woodbridge to properly value the property serving as collateral on the loan (which it does through the use of certified appraisals and Broker Price Opinions), including the potential for depreciation, to file the Massachusetts Investor's security interest on local land records, and to obtain title insurance on property."

55.    Under the May 2015 Massachusetts Consent Order, Woodbridge was directed to make an offer of rescission to all eligible Massachusetts investors, in addition to the imposition of a $250,000 fine payable to the Commonwealth of Massachusetts.

Texas

56.     As publicly reported, on July 17, 2015, the Texas State Securities Board issued an Emergency Cease and Desist Order against certain Respondents, including Woodbridge Mortgage Investment Fund 3, LLC, Robert Shapiro in his capacity as then-acting Woodbridge CEO, as well as certain individuals and business entities comprising part of Woodbridge's nationwide sales network ("Texas Emergency Order").  Attached hereto as Exh. 3 is a copy of the Texas Emergency Order.

57.     Among the factual findings by the Staff of the Texas States Securities Board, as enumerated in its July 2015 order, were the following, in relevant part:

(i)      "Respondent Woodbridge, Shapiro… are offering for sale investments in Respondent Woodbridge's First Position Commercial Mortgage Note Program."

(ii)     "The investments in the Note Program have not been registered by qualification, notification or coordination, and no permit has been granted for their sale in Texas."

(iii)    "Regulation D, Rule 506, promulgated under the Securities Act of 1933, authorizes issuers to engage in general solicitation when selling covered securities and preempts state securities registration laws

provided that, among other things, all purchasers of the securities are accredited investors and the issuers take reasonable steps to verify that such purchasers are accredited investors."

(iv)   "Respondents are not taking reasonable steps to verify that all purchasers are accredited investors."

58.   Pursuant to the July 2015 Texas Emergency Order, the Texas State Securities Board concluded that Woodbridge's so-called FPCMs were, in fact, securities as defined by Section 4.A of the Texas Securities Act.  Moreover, Texas securities regulators concluded that Respondents Woodbridge and Shapiro were "[e]ngaging in fraud in connection with the offer for sale of securities."

59.   In rendering its order, the Texas State Securities Board determined that Woodbridge had intentionally failed to disclose the identities and qualifications of its principals, did not disclose the assets and liabilities relevant to the company's ability to pay investors monthly returns and return of principal, did not disclose the anticipated use of funds nor allocation of costs associated with the FPCM program, and failed to disclose that it would pool investor funds until raising enough to fund a commercial loan.

60.   On March 18, 2016, Woodbridge (through its Woodbridge Mortgage Investment Fund 3) and Robert Shapiro consented to an order by the Texas State

Securities Board ("Texas Consent Order").  The Texas Consent Order found that Robert Shapiro was the controlling person of Woodbridge Mortgage Investment Fund 3, concluded that FPCMs were securities, and concluded that Woodbridge and Shapiro violated the Texas Securities Act by offering unregistered securities.

<u>Arizona</u>

61.     On October 4, 2016, the Securities Division of the Arizona Corporation Commission issued a Temporary Cease and Desist Order against certain Respondents, including in relevant part, Woodbridge and certain of its funds, in addition to Robert Shapiro ("Arizona Temporary Order").  Attached hereto as Exh. 4 is a copy of the Arizona Temporary Order.

62.     Pursuant to the Arizona Temporary Order, Arizona securities regulators identified the FPCMs as "[s]ecurities in the form of notes, investment contracts, and real property investment contracts."

63.     Further, Arizona securities regulators identified certain risks associated with an investment in a Woodbridge FPCM, including potential difficulty in assigning a valuation to the underlying real estate: "The value of the real estate collateral for the hard-money loan might be too low due to depreciation or the Woodbridge Funds' failure to properly value it."

64.    In similar fashion to the approach taken by Texas securities regulators, the Arizona Temporary Order not only alleged violations in connection with failure to properly register securities (or, in the alternative, claim a valid exemption), but also alleged securities fraud in connection with the offer or sale of securities in violation of the Arizona Securities Act. <u>Pennsylvania</u>

65.    On April 24, 2017, the Commonwealth of Pennsylvania Bureau of Securities Compliance and Examinations entered into a Consent Agreement and Order with Woodbridge Structured Funding, LLC ("Pennsylvania Consent Order").  Attached hereto as Exh. 5 is a copy of the Pennsylvania Consent Order.

66.    As with other investigations conducted by various state securities regulators, the Pennsylvania Bureau of Securities reviewed "[t]he business practices of Woodbridge… its affiliates and investment funds and products… and its officers, employees and agents."  As a result of that investigation, Pennsylvania securities regulators concluded that Woodbridge had operated in violation of the Pennsylvania Securities Act of 1972 by virtue of its attempt to "[e]ffect purchases or sales of securities issued by Woodbridge" where the individual selling these investment products was neither registered pursuant to Pennsylvania securities laws, nor exempt from registration.

67.     Pursuant to the Pennsylvania Consent Order, Woodbridge agreed to pay an administrative assessment of $30,000, and further, was ordered to comply with the Pennsylvania Securities Act of 1972.

Michigan

68.     On August 8, 2017, the State of Michigan Securities Bureau issued a Cease and Desist Order as against Woodbridge affiliate Woodbridge Mortgage Investment Fund 2, LLC, in connection with the sales of Woodbridge FPCMs to Michigan investors ("Michigan Order").  Attached hereto as Exh. 6 is a copy of the Michigan Order.

69.     In connection with Michigan's investigation into the matter, it was determined that Woodbridge "[o]ffered and sold [FPCMs] in Michigan that fell within the definition of 'security'; approximately 230 investors invested more than $14,000,000.00 with Respondent and its affiliated companies.  The [FPCMs] were not federally covered, exempt from registration, or registered."

70.     Furthermore, the Michigan Securities Bureau expressed concern with the Woodbridge business model, and more specifically, its failure to disclose certain material information to prospective investors, including:

"… relevant financial information to demonstrate to investors that the issuer had the ability to pay the promised return [as well as communicating] to investors that Respondent had been ordered by multiple jurisdictions to cease and desist from offering the notes for

CLASS ACTION COMPLAINT
-32-

sale.  A reasonable investor may have considered the cease and desist orders issued by Massachusetts, Texas, and Arizona important to his or her investment decision, meaning that the omission was material."

71.    Pursuant to the Michigan Order, Woodbridge agreed to cease and desist from offering or selling unregistered securities and from omitting material information in connection with the offer and sale of securities, as well as the imposition of a monetary fine of $500,000.

### SEC Investigation

72.    Beginning in or around September 2016, at the same time that numerous state securities regulators were conducting investigations into Woodbridge, the SEC initiated its own investigation into Woodbridge on the federal level, with an initial focus on "possible violations of the securities laws," including "the offer and sale of unregistered securities, the sale of securities by unregistered brokers, and the commission of fraud in connection with the offer, purchase, and sale of securities."

73.    On January 31, 2017, as the SEC's investigation into Woodbridge progressed, the Commission sought documents from Woodbridge and its principal and then-CEO, Mr. Shapiro, via subpoena.

74.    On July 17, 2017, having obtained a court order requiring production under its January subpoena, the Commission brought an enforcement action

against Woodbridge in federal court in the Southern District of Florida (Case No. 17-mc-22665-Altonga/Goodman) following Woodbridge's failure to produce documents relevant to the SEC's investigation, including company emails of Robert Shapiro and Woodbridge's controller.

75.     On October 31, 2017, the SEC brought a second subpoena enforcement action against Woodbridge in the Southern District of Florida (Case No. 17-mc-23986-Huck/McAliley) against 235 Limited Liability Companies affiliated with Woodbridge, after those same 235 LLC's failed to produce documents as required under the SEC's August 16 and 17, 2017 subpoenas seeking information related to Woodbridge's ownership structure and payments purportedly made by certain LLC's to Woodbridge.

<u>Woodbridge Declares Bankruptcy</u>

76.     Under intense regulatory scrutiny at both the federal and state level for its questionable business practices, on December 4, 2017, Woodbridge voluntarily sought Chapter 11 bankruptcy protection. *See In re Woodbridge Group of Companies LLC, et al.*, Case No. 17-12560 (Bankr. D. Del. Dec. 4, 2017).

77.     In the immediate aftermath of Woodbridge filing for bankruptcy, the company sent investors a letter, dated December 5, 2017, and which stated, in relevant part: "While Woodbridge continues to be a leading developer of high-end

real estate, as the business has grown, increased operating and development costs have been exacerbated by the unforeseen costs associated with ongoing litigation and regulatory compliance.  This combination of rising costs and regulatory pressure led to a loss of liquidity, resulting in an inability to make our regularly scheduled one-year Notes payment due December 1, 2017."

78.    Not fully explained in Woodbridge's December 5 investor letter was the following revelation, as set forth in Woodbridge's bankruptcy petition:

> While the Debtors believe that the Noteholders' liens on Third-Party Collateral are not properly perfected and are thus subject to avoidance, out of an abundance of caution, at this stage in the proceedings the Debtors are making available conditional adequate protection to the Noteholders…

79.    From the outset of Woodbridge's bankruptcy proceeding, the distressed real estate company has essentially asserted that FPCM investors do not possess perfected liens, and therefore, are unsecured creditors who will not stand to receive a penny in bankruptcy until after secured creditors have been paid in full.

80.    Unsurprisingly, the news of Woodbridge's bankruptcy caused numerous investors, including Plaintiffs, great distress and shock, particularly given the fact that Woodbridge FPCMs and Units were aggressively marketed and touted as safe and conservative financial instruments.

/ / /

SEC Enforcement Action in Federal Court

81.    From the SEC's perspective, Woodbridge's decision to voluntarily file for Chapter 11 bankruptcy did nothing to change the company's questionable business model and practices.  In fact, on December 20, 2017, the Commission filed a Complaint for Injunctive and Other Relief (U.S. District Court, Southern District of Florida Case No. 1:17-cv-24624-MGC, hereinafter the "SEC Action") alleging as follows:

**"Beginning in July 2012 through December 4, 2017, Defendant [Robert Shapiro] used his web of more than 275 Limited Liability Companies to conduct a massive Ponzi scheme raising more than $1.22 billion from over 8,400 unsuspecting investors nationwide through fraudulent unregistered securities offerings.** Despite receiving over one billion in investor funds, Shapiro and his companies only generated approximately $13.7 million in interest income from truly unaffiliated third-party borrowers.  Without real revenue to pay the monies due to investors, Shapiro resorted to fraud, using new investor money to pay the returns owed to existing investors." (emphasis added).

82.    In formally announcing charges, as well as an asset freeze, against Woodbridge and its related unregistered affiliate investment funds, the SEC essentially halted Defendant Shapiro and Woodbridge from conducting any further sales of unregistered securities to unwitting and vulnerable investors nationwide.

83.    In an Amended Complaint filed on May 4, 2018, the SEC alleged that Woodbridge:

[P]romised investors they would be repaid from the high rates of interest Shapiro's companies were earning on loans the companies were purportedly making to third-party borrowers. However, nearly all the purported third-party borrowers were actually limited liability companies owned and controlled by Shapiro, which had no revenue, no bank accounts, and never paid any interest under the loans. (Amended Complaint in SEC Action, ¶ 1)

84.     The SEC Action further alleged that Woodbridge offered its FPCM product to its external sales agents at a 9% wholesale rate, and the agents in turn offered the FPCM to their investor clients at 5% to 8% annual interest—the external sales agent received a commission equivalent to the difference.  As alleged in the SEC Action, Woodbridge paid external sales agents at least $64.5 million in commissions through this arrangement.  The SEC Action further alleges that "many of these sales agents were not associated with registered broker-dealers or investment advisory firms.  Several of these sales agents, including some of the highest producers, had been censured or barred by the Commission, FINRA or state securities regulators."

85.     In May 2018, the Court in the SEC Action entered an injunction against certain of the defendants therein, including Woodbridge and its affiliated funds, prohibiting Woodbridge from selling any further unregistered securities in the United States. *See* SEC Action, ECF No. 151 (Judgment As To Debtor Defendants).

### *Defendants Failed To Conduct Minimal Due Diligence and Ignored Numerous Red Flags Revealing Woodbridge's Unlawful Conduct*

86.     At all relevant times, Defendants had a duty to safeguard and manage the IRA accounts of Plaintiffs and the Class in a professional and fiduciary manner in accordance with industry standards and applicable state and federal laws.

87.     Despite their duties to Plaintiffs and the Class, from the outset Defendants failed to adhere to even the most basic federally mandated rules and requirements concerning IRAs and SDIRAs and were grossly negligent in choosing to flagrantly ignore the numerous red flags surrounding Woodbridge's unlawful conduct.

88.     As alleged in the SEC Action, instead of issuing loans to unaffiliated third-party borrowers in arms-length transactions, Woodbridge used Woodbridge Securities investor funds to purchase almost 200 residential and commercial properties located primarily in Los Angeles, California and Aspen, Colorado. Woodbridge placed title to those property in the name of LLCs, which were ultimately owned and/or controlled by Shapiro, rather than third-party borrowers as was represented to investors on the face of Woodbridge promissory notes.  The promissory notes identified the borrower, but did not indicate that the particular LLC listed as a borrower was controlled by Shapiro.

89.     Beginning in December 2013, when Fund 2 was formed, and subsequently with Funds 3, 3A, and 4 (*i.e.,* throughout the Class Period herein) the amount of funds loaned to entities affiliated with Shapiro was in excess of 70%--and as high as 98%--of Woodbridge's overall loan portfolio.  Provident apparently took no steps to verify the identity of purported third-party borrowers and failed to discover that most of the "borrowers" were shell companies controlled by Shapiro-despite Woodbridge's almost complete lack of any *bona fide* third-party borrowers and nearly universal extension of "loans" to shell companies with no revenues and no bank accounts.  Defendants also apparently failed to discover that nearly all of the purported third-party borrowers never paid any interest whatsoever on the so-called "loans" underlying the promissory notes.

90.     Defendants' repeated representation that Woodbridge Securities retained "fair market value" equal to the purchase price was predicated on the creditworthiness of the Woodbridge entities' borrowers- yet Defendants apparently took no steps to verify the LLCs' assets, income or ability to repay loans.  The vast majority of the purported third-party borrowers had no source of income, no bank accounts, and never made any loan payments to Woodbridge.  In short, Woodbridge Securities were pieces of paper representing promises to pay,

guaranteed largely by asset-free shell companies, set up and controlled by Woodbridge's principal, Shapiro.

91.     Defendants also ignored the red flag that a large proportion of Woodbridge's sales agents, with whom Defendants regularly interacted in transferring accounts from other IRA custodians to Provident, were **not** registered representatives with FINRA member firms, and therefore were **not** licensed to sell securities.  In fact, many of Woodbridge's unlicensed sales agents were **former** licensed FINRA registered representatives who had lost their licenses to sell securities due to misconduct- a status that was readily discoverable via a rudimentary Internet search of FINRA's public database, accessible at https://brokercheck.finra.org/.

92.     The fact, well known to Defendants, that most of Woodbridge's sales agents were not licensed to sell securities, should have assumed great significance considering that Woodbridge FPCMs and Units are clearly securities within the definitions promulgated by the SEC and the courts.  Promissory notes are presumptively defined as securities, and furthermore the FPCMs clearly meet the definition of securities set forth by the U.S. Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946) (defining an investment contract as (1) an

investment of money, (2) in a common enterprise, (3) with the expectation of profits produced solely by the efforts of others").

93.     Defendants were also aware that Woodbridge FPCMs and Units were not registered with the SEC or state securities regulators.

94.     Thus, by being aware the Woodbridge FPCMs and Units are securities, were not registered, and were being sold by Woodbridge's unlicensed sales representatives, Defendants had actual knowledge that Woodbridge was engaged in the unlawful sale of unregistered securities by unlicensed persons.

95.     Even if these facts had not been readily apparent based on the nature of Woodbridge Securities and Woodbridge's unlicensed sales staff, as previously alleged herein (*see supra*, ¶¶ 52-75, 81-85), Woodbridge was the subject of numerous investigations and legal actions at both the state and federal level by various state securities regulators, as well the SEC.  All these aforementioned state and federal regulators who have reviewed the matter to date- Massachusetts, Texas, Arizona, Pennsylvania, Michigan and the SEC- have unanimously concluded that Woodbridge engaged in the unlawful sale of unregistered securities. Furthermore, Massachusetts' public findings concerning Woodbridge date back to May 2015, or over two and one-half years before Woodbridge declared bankruptcy. *See* Exh 2.

96.     Despite Defendants' gross negligence in choosing to turn a blind eye
to Woodbridge, other companies that also operate in the SDIRA arena took notice.
For example, in November 2017, another Woodbridge custodian, Mainstar Trust,
apprised Woodbridge investors that "From time to time, Mainstar becomes aware
of publicly available information that might be of interest to certain account
holders.  It is our understanding that on November 1, 2017, the Securities and
Exchange Commission (SEC) released on their website, information concerning
Woodbridge assets."  Attached hereto as Exh. 7 is a redacted copy of the
November 6th letter from Mainstar Trust dispatched to SDIRA owners.

97.     Within the same letter, Mainstar reiterated its limited role as
custodian, and characterized that role as essentially "administrative in nature."
Nevertheless, as custodian of SDIRAs, Mainstar saw fit to  notify their clients of
certain publicly available information concerning Woodbridge, namely that the
SEC was investigating the company and that allegations had been raised
suggesting that Woodbridge was a Ponzi Scheme.

98.     Despite the fact that Defendants had ready access to the same publicly
available information as other SDIRA custodians concerning the SEC investigation
and lawsuit and Woodbridge's bankruptcy in late 2017, Defendants nevertheless
chose once again to turn a blind eye to the problem, treating Woodbridge securities

as retaining their full "fair market value" equal to the purchase cost as late as the end December 2017. *See* Exh. 8 (redacted Noel C. Murray Provident IRA statement for end of year 2018).

99.    Defendants also ignored the red flag that financial advisors who sold Woodbridge securities were, in some instances, paying IRA fees directly to Defendants, despite such payments being prohibited transactions within the meaning of IRS Publication 590-A. *See* ¶¶ 33-35, *supra.*

## CLASS ACTION ALLEGATIONS

100.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP").  The Class in this action ("Class") consists of all persons for whom Provident opened and/or maintained IRA accounts as custodian, that were invested in Woodbridge Securities (as defined above), at any time between January 1, 2014 and December 31, 2017 inclusive (the "Class Period").  Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with Woodbridge.

101.    At least hundreds of persons are believed to be members of the putative Class, and those persons or entities are geographically dispersed. Therefore, joinder is impracticable pursuant to FRCP Rule 23(a)(1).

102.   Common issues of fact or law predominate over individual issues within the meaning of FRCP Rule 23(a)(2).  Common issues of law and fact include but are not limited to:

(i)   whether Defendants breached the PTG Trust Agreement by virtue of their uniform acts and omissions alleged herein;

(ii)   whether the Defendants breached their fiduciary duty to Plaintiffs and the Class by virtue of their uniform acts and omissions alleged herein;

(iii)   whether  Defendants acted negligently by virtue of their uniform acts and omissions alleged herein; and

(iv)   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

103.   Plaintiffs' interests are typical of, and not antagonistic to the interests of, the Class.

104.  Plaintiffs have retained competent counsel experienced with class actions and complex litigation and intend to vigorously prosecute this action.

105.  Common issues predominate.  A class action is superior to all other methods for the fair and efficient adjudication of this controversy.  Indeed, a class

action is the only method by which Plaintiffs and the Class can efficiently seek

redress and obtain a uniform adjudication of their claims.

106.   The size of individual damages is small in comparison to the

complexity and scope of the Defendants' alleged unlawful conduct.  Plaintiffs do

not anticipate any difficulties in the management of this action as a class action.

### AS AND FOR A FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT
### UNDER STATE AND FEDERAL LAW

107.   Plaintiffs incorporate by reference the allegations set forth above as

though fully set forth herein.

108.   There is a substantial federal interest in the proper establishment and

administration of IRA custodial accounts and in preserving and maintaining the

security of individuals' retirement savings.

109.   Defendants acknowledged the substantial federal interest in the PTG

Trust Agreement by reciting that the subject SDIRAs are governed by the Internal

Revenue Code and reciting that Articles I through VII of the PTG Trust Agreement

"have been approved by the IRS." *See* Exh. 1 at p. 13.

110.   Federal law imposes the obligations on SDIRA trustees that have been

previously alleged above. *See, e.g.,* 26 C.F.R. § 1.408-2(e).  These obligations are

incorporated in the PTG Trust Agreement including without limitation at Article

V(2) ("The custodian agrees to submit to the Internal Revenue Service (IRS) the reports prescribed by the IRS") and Article VIII (8.16) ("Each year (and when you take IRA distributions), we are required to report the fair market value ('FMV') of the assets within your IRA to the IRS. …").

111.   By entering into the PTG Trust Agreement, Defendants further agreed to act as trustee and perform the fundamental common law duties of a trustee to preserve and maintain trust assets.  These duties include the duty to determine exactly what property forms the subject-matter of the trust and to use reasonable diligence to locate and safeguard trust property.

112.   Federal law also includes the duty to avoid commingling the assets of the trust with other assets.  Such a duty arose here under the IRS Code § 408(a)(5) ("The assets of the trust will not be commingled with other property except in a common trust fund or common investment fund").

113.   Defendants failed to perform contractual obligations by virtue of their conduct and omissions herein by failing to ascertain the nature of Woodbridge Securities, failing to verify, secure and safeguard the purported underlying assets of same, failing to provide accurate fair market value annual valuations of Woodbridge Securities, causing and/or knowingly permitting Class members to

engage in prohibited transactions with disqualified persons, and otherwise as further alleged herein.

114.   As a direct, foreseeable and proximate result of Defendants' breaches of contract, Plaintiffs and the Class suffered damages.

## AS AND FOR A SECOND CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY UNDER STATE AND FEDERAL LAW

115.   Plaintiffs incorporate by reference the allegations set forth above as though fully set forth herein.

116.   As trustees of Plaintiffs' IRA accounts, Defendants owed Plaintiffs and the Class members a fiduciary duty under federal regulations as well as the common law.  By reason of their fiduciary relationship, Defendants owed Plaintiffs and Class members the duties of good faith, fair dealing, loyalty, due care, and candor with respect to the fulfillment of Defendants' duties under the trust and their conduct respecting the trust res.

117.   Defendants breached fiduciary duties to Plaintiffs and the Class by failing to ascertain the nature of Woodbridge Securities, failing to verify, secure and safeguard the purported underlying assets of same, failing to provide accurate fair market value annual valuations of Woodbridge Securities, causing and/or knowingly permitting Class members to engage in prohibited transactions with disqualified persons, and otherwise, as further alleged herein.

118.   As a foreseeable result of these breaches, Woodbridge was able to commingle and/or dissipate Class Members' funds, and Plaintiffs and the Class have suffered damages.

119.   Defendants are liable for actual and punitive damages in an amount to be determined at trial attributable to the conduct of Defendants that was reckless, willful, wanton and without regard to the rights of Plaintiffs and the Class.

## AS AND FOR A THIRD CAUSE OF ACTION FOR NEGLIGENCE AND GROSS NEGLIGENCE

120.   Plaintiffs incorporate by reference the allegations set forth above as though fully set forth herein.

121.   As alleged herein, in an extreme departure from ordinary standards of care, Defendants negligently failed to preserve, retain control over, hold and safe-keep the trust res that each Class member entrusted to Defendants.

122.   The Defendants' foregoing conduct constitutes gross negligence.

123.   As a direct, proximate and foreseeable result of Defendants' ordinary and gross negligence under the common law, Plaintiffs and each Class member suffered damages.

/ / /

## AS AND FOR A FOURTH CAUSE OF ACTION FOR UNJUST ENRICHMENT AND RESTITUTION

124.   Plaintiffs incorporate by reference the allegations set forth above as though fully set forth herein.

125.   Defendants' foregoing conduct and receipt of funds requires them to make restitution and disgorge all sums by which Defendants have been unjustly enriched.

## JURY DEMAND

126.  Plaintiffs demand a trial by jury on all causes of action so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.   Certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and certifying Plaintiffs as class representatives and appointing their counsel as Class Counsel;

B.   Awarding compensatory damages against Defendants, jointly and severally, including disgorgement of all unjust enrichment;

C.   Awarding prejudgment interest;

D.   Awarding punitive damages as appropriate;

E.   Awarding extraordinary, equitable and/or injunctive relief as permitted by law (including but not limited to disgorgement);

F.   Awarding Plaintiffs' the costs and expenses of this litigation, including reasonable attorneys' fees, and experts' fees and other costs and disbursements; and

G.   Granting Plaintiffs such other and further relief as to the Court may seem just and proper.

Dated this July 25, 2018

　　　　　　　　　　　/s/ Martin L. Welsh
　　　　　　　　　　　Martin L. Welsh

　　　　　　　　　　THE LAW OFFICE OF HAYES & WELSH
　　　　　　　　　　Martin L. Welsh, Esq. (Nevada Bar No. 8720)
　　　　　　　　　　199 N. Arroyo Grande Blvd., Suite 200
　　　　　　　　　　Henderson, Nevada 89074
　　　　　　　　　　Telephone: (702) 434-3444
　　　　　　　　　　Email: mwelsh@lvlaw.com

　　　　　　　　　　LAW OFFICE OF CHRISTOPHER J. GRAY P.C.
　　　　　　　　　　Christopher J. Gray (Counsel will comply with
　　　　　　　　　　LR IA 11-2 within 45 days.)
　　　　　　　　　　Michael Giarrusso (Counsel will comply with
　　　　　　　　　　LR IA 11-2 within 45 days.)
　　　　　　　　　　360 Lexington Ave, 14th Floor
　　　　　　　　　　New York, New York 10017
　　　　　　　　　　Telephone: (866) 966-9598
　　　　　　　　　　Facsimile: (212) 937-3139
　　　　　　　　　　Email: chris@investorlawyers.net
　　　　　　　　　　Email: mike@investorlawyers.net

LAW OFFICES OF JOSHUA B. KONS, LLC
Joshua B. Kons (Counsel will comply with
LR IA 11-2 within 45 days.)
100 Pearl Street, 14th Floor
Hartford, CT 06103
Telephone: (860) 920-5181
Facsimile: (860) 920-5174
Email: joshuakons@konslaw.com

*Attorneys for Plaintiffs and the Proposed Class*